# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEAGUE OF WOMEN VOTERS
EDUCATION FUND
1233 20th Street, NW, Suite 500
Washington, DC 20036;

LEAGUE OF WOMEN VOTERS OF THE
UNITED STATES,
1233 20th Street, NW, Suite 500
Washington, DC 20036;

LEAGUE OF WOMEN VOTERS OF
ARIZONA,
1934 East Camelback Road, Suite 120
Phoenix, AZ 85016;

HISPANIC FEDERATION,
55 Exchange Place, 5th Floor
New York, NY 10005;

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
4805 Mt. Hope Drive
Baltimore, MD 21215;

OCA – ASIAN PACIFIC AMERICAN
ADVOCATES,
900 19th St. NW, 6th Floor
Washington, DC 20006;

ASIAN AND PACIFIC ISLANDER
AMERICAN VOTE,
1025 Connecticut Ave. NW, Suite 600
Washington, DC 20036;

                         *Plaintiffs*,
        v.

DONALD J. TRUMP,
in his official capacity as President of the
United States,
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500;

UNITED STATES ELECTION ASSISTANCE
COMMISSION,
633 3rd Street, NW, Suite 200

Case No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Washington, DC 20001;

DONALD L. PALMER,
in his official capacity as Chairman and a
Commissioner of the Election Assistance
Commission,
633 3rd Street, NW, Suite 200
Washington, DC 20001;

THOMAS HICKS,
in his official capacity as Vice Chair and a
Commissioner of the Election Assistance
Commission,
633 3rd Street, NW, Suite 200
Washington, DC 20001;

CHRISTY MCCORMICK,
in her official capacity as a Commissioner of
the Election Assistance Commission,
633 3rd Street, NW, Suite 200
Washington, DC 20001;

BENJAMIN W. HOVLAND,
in his official capacity as a Commissioner of
the Election Assistance Commission,
633 3rd Street, NW, Suite 200
Washington, DC 20001;

BRIANNA SCHLETZ,
in her official capacity as Executive Director
of the Election Assistance Commission,
633 3rd Street, NW, Suite 200
Washington, DC 20001;

*Defendants.*

Plaintiffs, by and through their attorneys, bring this Complaint against Defendants and in support state the following:

## **INTRODUCTION**

1.      In the President's Executive Order of March 25, 2025—"Preserving and Protecting the Integrity of American Elections" (the "Executive Order")—the President attempts to usurp the

2

power to regulate federal elections from Congress, the States, and an independent agency to which Congress delegated certain limited responsibilities.

2.      The President may do no such thing. Under the Constitution, the President has no authority to make or change the rules for conducting federal elections.

3.      Not only does the Executive Order attempt to rip power away from the entities that have actual constitutional and statutory authority to regulate federal elections, it does so in violation of the text and purpose of federal laws Congress enacted to make it easier for Americans to register to vote and cast ballots in federal elections.

4.      Specifically, the Executive Order purports to order the Election Assistance Commission ("EAC") to require a passport or other citizenship document to register to vote using the federal voter registration form prescribed by Congress (the "Federal Form"), and to do so within 30 days. Yet federal law gives the President no authority over the Federal Form specifically and federal elections more broadly. And the President has no decision-making authority over the EAC, an independent bipartisan agency. That agency has repeatedly considered and rejected requests to add such a requirement of documentary proof of citizenship to the Federal Form.

5.      The Executive Order also unlawfully claims to direct the EAC to take other actions, including decertifying all state voting machines across the country, and purportedly imposes a nationwide absentee and mail ballot receipt deadline for federal elections that would effectively overturn the laws of eighteen states by executive fiat and threat of coercive action. The scope and impact of this attempted power grab is staggering. With a stroke of the pen, the President claims unilateral authority to change the rules for voter registration and election administration across the country in a manner that would threaten the ability of millions of eligible Americans to register and vote and upend the administration of federal elections.

6.      Plaintiffs League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA-Asian Pacific American Advocates, and Asian and Pacific Islander American Vote are non-partisan voting rights organizations whose core mission

is to register voters. They challenge the Executive Order's documentary proof-of-citizenship requirement, which violates federal law in at least two ways, each of which threatens Plaintiffs and their members with irreparable harm.

7.     First, the Executive Order violates the constitutional separation of powers. The Constitution gives to the states and to Congress—not the President—the power to regulate federal elections. Nothing in the Constitution gives the President authority over federal elections. Moreover, to prevent partisan manipulation of election rules, Congress, through the Elections Clause, created the EAC as an independent, bipartisan agency. The President therefore has no authority to direct the EAC to do anything, including to make changes to the Federal Form, and his attempts to do so are thus unconstitutional.

8.     Second, the Executive Order is illegal for the independent reason that it commands the EAC to break the law. Regardless of the President's authority to issue any directives to the EAC (and to be sure, he has none), under the National Voter Registration Act ("NVRA"), it is unlawful to add a documentary proof-of-citizenship requirement to the Federal Form without first finding that it is "necessary to enable" state election officials to assess voter eligibility. No such finding exists here (nor could such a finding exist), and the President's directive therefore runs afoul of the NVRA.

9.     Because the EAC has been ordered to act within 30 days, time is of the essence. The Executive Order would make it impossible for Plaintiffs to use the Federal Form in efforts to register eligible voters. And it would impose a severe burden on, if not wholly disenfranchise, millions of voters—including some of Plaintiffs' members, particularly those in Arizona who rely on the Federal Form to register to vote and update their registration—who do not have nor could easily obtain the documents the Executive Order demands.

10.     To avoid this imminent harm, Plaintiffs respectfully request the Court (1) declare that the Executive Order cannot force the EAC to do anything, much less add an illegal requirement to the Federal Form, and (2) enjoin the EAC from complying with the President's directive.

**PARTIES**

11.     Plaintiff League of Women Voters ("LWV" or "the League") is a nonprofit, nonpartisan, grassroots, community-based membership organization headquartered in Washington, D.C. that promotes political responsibility by encouraging Americans to participate in the electoral process. Founded in 1920 as an outgrowth of the struggle to win voting rights for women, the League now has more than a million members and supporters and is organized in more than 700 communities and in every state and the District of Columbia. The League comprises two branches: the League of Women Voters of the United States ("LWVUS") and the League of Women Voters Education Fund ("LWVEF"). LWVUS "encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education, and advocacy." LWVUS is a 501(c)(4) social welfare organization. *See* LVW, Ways to Give, https://perma.cc/U3VP-HETC. LWVEF "works to register and provide voters with election information through its election resource VOTE411.org, candidate forums, and debates."

12.     As part of its mission, the League—with its state and local Leagues—operates one of the longest-running and largest nonpartisan voter registration efforts in the nation. The League's core mission mirrors the NVRA's stated goals of "increas[ing] the number of eligible citizens who register to vote in elections for Federal office" and implementing procedures at all levels of government to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501. The League founded the Motor Voter Coalition in the 1980s and 1990s and served as national co-chair of the campaign to pass and implement the NVRA. *See* LWV, Honoring the National Voter Registration Act, https://perma.cc/9WEK-QLLR. The League has been one of the foremost active defenders of the NVRA by, *inter alia*, notifying, working with, and/or filing enforcement lawsuits against Secretaries of State to correct NVRA violations in Alabama, Arizona, Florida, Georgia, Louisiana, Montana, Ohio, Pennsylvania, Tennessee, and Texas. It also has filed litigation to protect the spirit and text of the NVRA. Through its work, the League registers many thousands of voters every election cycle and is instrumental in ensuring

access to voter registration for all eligible voters. The League maintains—with its state and local Leagues—VOTE411.org, an award-winning non-partisan, online resource committed to ensuring voters have the information they need to successfully participate in every election—local, state, and federal.

13. Plaintiff League of Women Voters of Arizona ("LWV Arizona") is the Arizona state affiliate of the League. Members of LWV Arizona are also members of the League. LWV Arizona is a nonprofit, nonpartisan membership organization committed to protecting the right to vote and promoting informed participation in the democratic process. For over 80 years, LWV Arizona has been dedicated to protecting and promoting democratic government through public service, civic participation, and robust voter education and registration. To further its mission, LWV Arizona's more than 900 members frequently conduct voter registration drives throughout the state, and its members and leadership are familiar with the nuances of voter registration in Arizona. To protect the voting rights of Arizonans, LWV Arizona has participated as a plaintiff and as amicus in several cases impacting voter registration in Arizona. LWV Arizona's core mission is consistent with the NVRA's purpose to "increase the number of eligible citizens who register to vote in elections for Federal office" and to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501.

14. Plaintiff Hispanic Federation is a nonprofit, nonpartisan, community organizing and advocacy organization. Hispanic Federation's mission is to empower and advance the Hispanic community, support Hispanic families, and strengthen Latino institutions. Hispanic Federation serves all individuals and communities that seek assistance in the areas of education, health, immigration, civic engagement, economic empowerment, and the environment, including by promoting voter engagement. And it works nationally to strengthen Latino nonprofits, promote public policy advocacy, and bring to scale a portfolio of innovative community programs through three essential pillars: membership services, advocacy services, and community assistance program. This work assists the Hispanic electorate and other marginalized communities to register to vote, apply for vote-by-mail ballots, and vote in local and federal elections.

15.    Plaintiff the National Association for the Advancement of Colored People ("NAACP"), founded in 1909, is the largest and oldest civil rights organization in the United States. Its mission is to ensure educational, social, and economic equality of all persons and to eliminate race-based discrimination. The NAACP has over two million supporters and members, including voters throughout the United States. It has state and regional conferences representing 48 states, with nearly 2,200 units across the United States.

16.    Consistent with its mission, the NAACP has long worked to remove all barriers of racial discrimination through democratic processes and through the enactment and enforcement of federal, state, and local laws securing civil rights, including laws related to voter registration. The NAACP conducts robust nonpartisan voter registration and education efforts nationwide, which are a core part of its mission. As one part of these efforts, the NAACP offers registration assistance, including but not limited to, connecting voters to the Federal Form through online platforms, which are utilized by people across the country, including in Arizona. In addition, the NAACP advocated for the passage of the NVRA, and, in 1993, then-Executive Director Benjamin Chavis spoke at the legislation's signing ceremony and stood with President Bill Clinton as he signed it into law. The NAACP has also brought landmark voting rights and other civil rights cases over its 115-year history and served as amicus in many such cases as well. The NAACP's core mission is aligned with the NVRA's purpose to "increase the number of eligible citizens who register to vote in elections for Federal office" and to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501.

17.    Plaintiff OCA-Asian Pacific American Advocates ("OCA") is a nonprofit membership organization with over 35 chapters and affiliates across the United States. It is headquartered in Washington, D.C. Founded in 1973, OCA is dedicated to advancing the sociopolitical and holistic well-being of Asian Americans, Native Hawaiians, and Pacific Islanders ("AANHPIs") in the United States in a variety of areas, including civic engagement through voter registration, education, and mobilization.

18.    OCA was founded in 1973 as the Organization of Chinese Americans with the purpose—like many membership associations before it—of providing a unified voice for Chinese Americans in the civil rights movement. As the AANHPI population of the United States grew and diversified following the elimination of most race-based immigration restrictions, the Organization of Chinese Americans also changed to reflect that growing diversity. In 2013, it renamed itself "OCA-Asian Pacific American Advocates" to reflect its work on behalf of all AANHPIs.

19.    Today, OCA chapters serve as their local communities' trusted voice and resource. They host cultural events; hold food and clothing drives; conduct community clean-ups; provide programming for AANHPI youth, professionals, and elders; conduct voter outreach and undertake other civic engagement work; and provide other resources to their communities, including information about COVID-19, small business support, and naturalization and citizenship application support. OCA has a total of approximately 200,000 members, including 3,000 paid members.

20.    OCA's mission, as well as its national and state policy priorities, includes defending the voting rights of the AANHPI community by reducing barriers from restrictive identification laws to burdensome registration windows to racist gerrymandering. OCA—through its state and local affiliates—regularly conducts nonpartisan voter registration efforts across the nation. To protect the voting rights of AANHPIs, OCA and its chapters and affiliates have participated as plaintiffs and as amici in several cases impacting voter registration and voting rights. OCA-National also serves as a resource hub for its chapters conducting civic engagement work to provide print and digital materials, research support, and technical support where needed. This includes creating state-level voter guides, directing them to in-language voter materials from government websites, including the Election Assistance Commission, and connecting them to youth volunteers for voter outreach work. OCA-National also hosts an annual virtual voter outreach event called "DJ the Vote" during which OCA members nationwide participate in text and phone banking to engage registered voters and eligible potential voters, often in-language.

Through these activities, OCA serves its core mission which mirrors the NVRA's stated goals of "increas[ing] the number of eligible citizens who register to vote in elections for Federal offices" and implementing procedures at all levels of government to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501.

21.    Plaintiff Asian and Pacific Islander American Vote ("es") is a nonpartisan nonprofit dedicated to engaging, educating, and empowering Asian American and Pacific Islander ("AAPI") communities to strengthen and sustain a culture of civic engagement. Headquartered in Washington, DC, APIAVote's mission is to get AAPIs registered and out to vote and protect the freedom to vote so that communities can advocate for the issues important to them. To do so, APIAVote works with over 60 partners in 29 states on outreach, organizing, and communications efforts that have reached millions of AAPI voters, helping them to register to vote, providing them information on voting absentee or in person, and educating voters on the importance of voting. Thus, APIAVote's core mission mirrors the NVRA's stated goals of "increas[ing] the number of eligible citizens who register to vote in elections for Federal offices" and implementing procedures at all levels of government to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501.

22.    APIAVote's core function in service of its mission is to educate AAPIs about how to register to vote and help them to register. APIAVote has created a national, multilingual voter registration portal to implement its multitouch voter engagement program that aims to contact voters through phone and text banking, multiple rounds of targeted translated mailers, coordination of door-to-door canvassing, and investments in ethnic media, targeted social media advertisements and content. In partnership with Rock the Vote, APIAVote's website has a voter registration portal based on the federal voter registration form that is available in multiple Asian languages including Korean, Tagalog, Ilocano, Hindi, Thai, Vietnamese, Chinese, Japanese, Urdu, and Bengali.

23.    Defendant Donald J. Trump is President of the United States. He is named in his official capacity.

24.    Defendant United States Election Assistance Commission is an independent agency of the United States, 52 U.S.C. §§ 20921–30. The EAC is responsible for developing the Federal Form, in consultation with the chief election officers of the States, for the registration of voters for elections for Federal office. 52 U.S.C. § 20508.

25.    Defendant Donald L. Palmer is the Chairman and a Commissioner of the Election Assistance Commission. He is named in his official capacity.

26.    Defendant Thomas Hicks is the Vice Chair and a Commissioner of the Election Assistance Commission. He is named in his official capacity.

27.    Defendant Christy McCormick is a Commissioner of the Election Assistance Commission. She is named in her official capacity.

28.    Defendant Benjamin W. Hovland is a Commissioner of the Election Assistance Commission. He is named in his official capacity.

29.    Defendant Brianna Schletz is the Executive Director of the Election Assistance Commission. She is named in her official capacity.

## JURISDICTION AND VENUE

30.    This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1346 (civil actions against the United States) because this action arises under the Constitution and laws of the United States and the Defendants in this action are the President and various U.S. officers in their official capacities.

31.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(A) because the Defendants are officers or employees of the United States acting in their official capacity or under color of legal authority, and at least one of them resides in this District. Venue is also proper under Section 1391(e)(1)(C) because Plaintiffs LWVEF, LWVUS, OCA, and APIAVote reside in this District and no real property is involved in the action.

32.    This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

33.    Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702.

**FACTUAL ALLEGATIONS**

I.    **THE STATES AND CONGRESS REGULATE FEDERAL ELECTIONS AS PROVIDED FOR IN THE CONSTITUTION**

34.    In the United States, federal elections are and have always been governed by the states and Congress. Federal elections are carried out by states at the state level, based largely on the rules and procedures set forth in state laws and state constitutions. Congress has broad powers to establish rules for federal elections and override the rules established by states, and so federal laws governing voting and elections are also added on top of this foundation.

35.    This duality is reflected in our Constitution, which has always provided in the Elections Clause that "[t]he Times, Places and Manner of holding [federal] Elections . . . shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4. The Constitution thus recognizes the lawmaking powers of the States and of Congress with respect to federal elections. It recognizes no power for the President.

36.    Congress exercises its power in different ways. Sometimes, Congress directly sets the rules for federal elections, while other times Congress delegates to a federal agency the power to set the rules within the limits prescribed by Congress. Where Congress does not legislate or delegate, the States are free to set the rules themselves. In other words, the President has no role to play in setting the rules for federal elections.

A.  **The National Voter Registration Act of 1993**

37.    In 1993, alarmed by declining voter participation in national elections, Congress enacted the National Voter Registration Act, Pub. L. No. 103–31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501 *et seq.*). With the NVRA, Congress sought to "increase the number of eligible citizens who register to vote in elections for Federal office," and eliminate "discriminatory and unfair registration laws and procedures [that] can have a direct and damaging

effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities," 52 U.S.C. § 20501(a)(3), (b)(1).

38.     To achieve these goals, Congress created several requirements for state and federal agencies to offer voter registration through departments of motor vehicles, a mail-in form, and applications for public assistance benefits. 52 U.S.C. §§ 20504, 20505, 20506. Congress also provided in the NVRA for a single national voter registration form that "[e]ach State shall accept and use," *id.* § 20505(a)(1), and delineated the contents of that Federal Form in detail, 52 U.S.C. § 20508(b). It also required states to accept the Federal Form by mail, rather than requiring an in-person visit to a registrar's office. 52 U.S.C. § 20505. In mandating the creation of this Federal Form and delineating its contents, Congress meant to ensure that states could not disenfranchise voters by setting discriminatory or burdensome registration requirements to vote in federal elections. 52 U.S.C. § 20501(a)(3).

39.     Consistent with Congress's purpose of making voter registration more accessible, the NVRA expressly limits the type and volume of information that may be required to register to vote for federal elections using the Federal Form. The Federal Form "may not include any requirement for notarization or other formal authentication" and "may require *only* such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), *as is necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b) (emphases added). Congress then tasked an independent bipartisan agency with evaluating what information is "necessary" for inclusion with the Federal From for the purposes of the statute. Originally, this authority was delegated to the Federal Elections Commission ("FEC"). *Id.* As described below, this authority was later transferred by Congress to the EAC which, like the FEC, is a bipartisan, independent body. 52 U.S.C. § 20508(a).

40.     The NVRA requires that the Federal Form "contain[] an attestation that the applicant meets" "each eligibility requirement (including citizenship)" that "requires the signature

of the applicant, under penalty of perjury." 52 U.S.C. § 20508(b)(2). Thus, every person that registers using the Federal Form must swear under penalty of perjury that they are a U.S. citizen. 52 U.S.C. §§ 20504(c)(2)(C), 20506(a)(6)(A), 20508(b)(2).

**B. The Help America Vote Act of 2002**

41.    Then, in the wake of the contested 2000 presidential election and the problems in election administration that the controversy that that election exposed, Congress enacted the Help America Vote Act ("HAVA"). *See* Help America Vote Act of 2002, Pub. L. No. 107–252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901 *et seq.*).

42.    Most relevant here, HAVA created the EAC as a bipartisan, independent agency. *See* 52 U.S.C. § 20921. The EAC has four commissioners, no more than two of whom may be affiliated with the same political party. *Id.* § 20923(a)(1), (b)(2). The commissioners are appointed by the President based on recommendations from the Majority and Minority Leaders of the House and Senate. *Id.* § 20923(a)(2). The Commission's staff includes an executive director. *Id.* § 20924(a). Congress prohibited the EAC from taking any action without "the approval of at least three of its members." *Id.* § 20928. In doing so, Congress ensured that no decision would be made without bipartisan support.

43.    HAVA transferred the authority to maintain the Federal Form from the FEC to the EAC. *See id.* § 20508(a). Congress gave the EAC the power, "in consultation with the chief election officers of the States," to "develop" the Federal Form and to promulgate regulations needed to carry out that task. 52 U.S.C. §§ 20508(a)(1)–(2), 20929. As a result, the EAC is the entity that must make "a necessity determination" before any changes are made to the Federal Form. *League of Women Voters of United States v. Harrington*, 560 F. Supp. 3d 177, 185 (D.D.C. 2021).

44.    Notably, this is the only regulatory authority that Congress gave the EAC. Indeed, Congress specified that the EAC "shall not have any authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local

government, except to the extent permitted under section 20508(a) of this title"—*i.e.*, except to maintain the Federal Form. 52 U.S.C. § 20929.

45.    When the EAC promulgates regulations to develop or change the Federal Form, it must do so through the ordinary regulatory process, including notice-and-comment rulemaking. The EAC's predecessor agency, the FEC, developed the initial federal form through an extensive notice and comment rulemaking process. *See* 58 Fed. Reg. 51,132 (Sept. 30, 1993) (Advanced Notice of Proposed Rulemaking); 59 Fed. Reg. 11,211 (Mar. 10, 1994) (Notice of Proposed Rulemaking); 59 Fed. Reg. 32,311 (June 23, 1994) (Final Rules). When the FEC's functions were transferred to the EAC pursuant to HAVA, the EAC once again engaged in notice and comment rulemaking to change the federal form to conform with HAVA. 75 Fed. Reg. 47,729 (Aug. 9, 2010) (Notice of Proposed Rulemaking).

46.    Congress also delegated to the EAC other duties with respect to the administration of Federal elections. 52 U.S.C. § 20922 (proscribing the six, limited duties of the EAC). Among those duties, the EAC is tasked with adopting voluntary guidance for voting systems, with the assistance of a technical guidelines committee also established by the statute. 52 U.S.C. §§ 20922(5), 20942, 20961, 20962. A "voting system" means the equipment and systems under which voters cast their ballots and their votes are counted. *See* 52 U.S.C. § 21081(b). As implied in the term, state adherence to the voluntary voting system guidelines ("VVSG") is voluntary. However, 11 states and Washington, D.C. have statutes or regulations that require all voting systems used in the state to be federally certified according to the applicable VVSG. The EAC is also tasked with providing for the certification and testing of state voting systems. 52 U.S.C. § 20971.

47.    The EAC is also responsible for disbursing congressionally appropriated federal funds to the states pursuant to formulas established by statute. *See id.* § 20922(4); *see also id.* §§ 21001(a), 21002. These funds are a modest but important source of money to support the upgrading and maintenance of state election systems. *Id.* §§ 20901–04.

### C.  Citizenship and the Federal Form

48.     The NVRA "acts as both a ceiling and a floor with respect to the contents of the Federal Form." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 18 (2013). Its text requires an attestation under penalty of perjury, rather than a passport or other document, to establish citizenship for voter registration purposes. Indeed, both Congress and the independent agencies that Congress tasked to maintain the Federal Form have rejected such a requirement.

49.     In 1993, during legislative debates on the NVRA, "[b]oth houses of Congress debated and voted on the specific question of whether to permit states to require documentary proof of citizenship in connection with the Federal Form, and ultimately rejected such a proposal." *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014) (citing congressional voting records); *see* S. Rep. No. 103-6, at 11 (1993) (concluding that the NVRA's requirement of an attestation under penalty of perjury and criminal penalties are "sufficient safeguards to prevent noncitizens from registering to vote").

50.     In 1994, in the FEC's final rulemaking promulgating regulations governing the Federal Form, the agency formally rejected commenters' requests to require additional evidence of citizenship, concluding instead that the "only . . . information . . . necessary," 52 U.S.C. § 20508(b)(1), to determine citizenship qualifications is the statutorily required attestation. The FEC explained that "[w]hile U.S. citizenship is a prerequisite for voting in every state . . . [t]he issue of U.S. citizenship is addressed within the oath required by the Act and signed by the applicant under penalty of perjury." *National Voter Registration Act of 1993*, 59 Fed. Reg. 32311-01, 1994 WL 275543 (June 23, 1994).

51.     Since the EAC assumed statutory responsibility for the Federal Form, it has correctly implemented the guidance of the NVRA itself by recognizing that the NVRA's citizenship attestation is the only information necessary to enable election officials to determine that an applicant meets the citizenship eligibility requirements. For example, in 2006, the EAC did not approve Arizona's requests for a state specific amendment to accommodate the state's documentary proof-of-citizenship procedure. U.S. Election Assistance Comm'n, Dkt. No. EAC-

2013-0004, Mem. of Decision Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Mail Voter Registration Form (Jan. 17, 2014) ("EAC Mem. of Decision") at 2.[1] In 2013, Arizona, Georgia, and Kansas asked the EAC to modify the Federal Form to instruct that applicants in those states provide documentary proof of citizenship to register to vote. But in a 2014 final agency decision, the Commission explained that both "the FEC and the EAC, in their implementing regulations, specifically considered and determined, in their discretion, that the oath signed under penalty of perjury, the words 'For U.S. Citizens Only' and later the relevant HAVA citizenship provisions, *see* 42 U.S.C. § 15483(b)(4)(A) (adding to the Federal Form two specific questions and check boxes indicating the applicant's U.S. citizenship), were all that was necessary to enable state officials to establish the bona fides of a voter registration applicant's citizenship." EAC Mem. of Decision at 22. Thus, the EAC rejected these states' efforts to require documentary proof of citizenship because it "would require applicants to submit more information than is necessary to enable election officials to assess eligibility," while a sworn attestation "provides the necessary means for assessing applicants' eligibility." EAC Mem. of Decision at 27–30. In 2016, when the EAC's executive director unilaterally purported to allow states to require documentary proof of citizenship with the Federal Form, a federal court vacated this decision and granted summary judgment in plaintiffs' favor. *League of Women Voters of United States*, 560 F. Supp. 3d at 188–89.

## II.  THE PRESIDENT UNLAWFULLY ATTEMPTS TO REGULATE FEDERAL ELECTIONS VIA EXECUTIVE ORDER

52.    Nothing in the Constitution gives the President any power or authority to make laws or rules governing federal elections.

53.    Nevertheless, on March 25, 2025, the President issued an Executive Order that purports to unilaterally and unlawfully change election rules and practices throughout the country in multiple ways—including ways that directly conflict with the rules enacted by Congress through

---

[1] This memorandum of decision is available at ECF No. 11-6, at 1:16-cv-00236-RJL (D.D.C.).

the lawmaking process. *See* Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025), https://perma.cc/EN47-E37Z (the "Executive Order").

54.    The Executive Order attempts to direct the EAC to "take appropriate action" within 30 days "to require" two changes to the Federal Form. Exec. Order § 2(a)(i).

55.    First, the Executive Order mandates that the Federal Form be altered to "require . . . documentary proof of United States citizenship." Exec. Order § 2(a)(i). The Order defines "documentary proof of citizenship" to include a copy of the following documents: "(A) a United States passport; (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States; (C) an official military identification card that indicates the applicant is a citizen of the United States; or (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship." Exec. Order § 2(a)(ii).

56.    Second, the Executive Order mandates that the Federal Form be altered to "require . . . a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. 21083(a)(5)(A), while taking appropriate measures to ensure information security." Exec. Order § 2(a)(i)(B).

57.    The Executive Order further directs the EAC to "take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. 21145," including the requirement that States accept and use the Federal Form, "including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order." Exec. Order § 4(a).

58.    In addition to the unlawful effort to direct the EAC to modify the Federal Form that Plaintiffs challenge here, the Executive Order dramatically and unlawfully remakes elections in other ways.

59.    For example, the Executive Order seeks to coerce states to modify their deadlines for receiving absentee or mail ballots so that ballots mailed before but received after Election Day will not count. Specifically, it directs the Attorney General to take "all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1"—*i.e.*, federal statutes that establish a uniform election day for federal elections—"against States that . . . includ[e] absentee or mail-in ballots received after Election Day in the final tabulation of votes . . . ." Exec. Order § 7(a). The Order further orders the EAC to "condition any available funding to a State on that State's compliance" with this interpretation of the Election Day statutes. *Id.* § 7(b). The Executive Order thus purports to nullify the laws in 18 states that permit the counting of timely postmarked absentee ballots received at some point after Election Day, and envisions coercive actions that agencies must take for states that have such laws on the books, even though those state laws are compliant with the federal statutes at issue.

60.    The Executive Order also implicates Congress' delegation of adopting voluntary guidance for voting systems ("VVSG") to the EAC, unlawfully directing the EAC to amend the VVSG 2.0 so that the guidelines prohibit the use of barcodes or quick-response ("QR") codes to encode votes and require voting systems to provide a voter-verifiable paper record. *Id.* § 4(b). Many states use barcodes or QR codes on their ballots.[2] Eleven states and Washington, D.C. have statutes or regulations that require all voting systems used in the state to be federally certified according to the applicable VVSG. The Executive Order also purports to direct the EAC to rescind all existing certifications of voting systems within 180 days of the Order's issuance (*i.e.*, by September 21, 2025). It further directs the EAC to "review, and if appropriate, recertify" voting systems under the new standards in VVSG 2.0 as amended by the Order. But there are currently no voting systems in the country that would meet those requirements. It could take years before a

_____

[2] Jessica Huseman, *Why Trump wants to ban barcodes on ballots, and what it means for voters and election officials*, VoteBeat (Mar. 28, 2025), https://perma.cc/657U-A5L7.

voting system could be certified to the amended VVSG 2.0. This could leave 11 states and Washington, D.C., without any legally available voting system for an indefinite time. It would also leave the EAC unable to comply with its statutory obligations under HAVA to timely adopt new or modified guidelines.

61.    Further, the Executive Order unlawfully directs the Secretary of Defense to "update the Federal Post Card Application . . . to require" voters to provide documentary proof of citizenship and proof of eligibility to vote in elections in the State in question. *Id.* § 3(d). This documentary proof-of-citizenship requirement is unlawful for similar reasons as it is on the Federal Form.

## III.    THE EXECUTIVE ORDER CAUSES SUBSTANTIAL, IRREPARABLE HARM.

62.    The Executive Order's attempt to direct the EAC to require documentary proof of citizenship on the Federal Form will impose a severe burden on or disenfranchise millions of voters who do not have and who cannot easily obtain the required documents, and will impose severe burdens on organizations—including Plaintiffs—whose core activities include voter registration.

### A.  Burdens on U.S. Citizens Registering to Vote or Updating Their Registration

63.    The Executive Order defines documentary proof of citizenship to include four different types of documents.

64.    First, a voter can use a U.S. passport. Roughly half of Americans, including 65 percent of Black Americans, lack a valid passport.[3] The application and execution fees for a new passport book can cost $165, and it can take up to two months to receive a passport.[4] Expedited

---

[3] Nathan Diller, *Americans want to see the world, but only 51% took this important step to do it*, USA Today (Oct. 23, 2024), https://perma.cc/SU4K-9K3K; YouGov, *Adults under 30 are more likely than older Americans to have a current U.S. passport*, (Aug. 31, 2023), https://perma.cc/5845-LNRK. *See also* U.S. Census Bureau, *Census Bureau Projects U.S. and World Populations on New Year's Day* (Dec. 30, 2024), https://perma.cc/26B8-794R (U.S. Census Bureau estimates population at 341,554,209); U.S. Dep't of State, Bur. Of Consular Affairs, *Reports and Statistics*, https://perma.cc/8A9R-59KY (last visited Apr. 1, 2025) (169,915,821 valid passports in circulation in Fiscal Year 2024).

[4] Bur. Of Consular Affairs, *Passport Fees*, U.S. Dep't of State, https://perma.cc/9BDE-2ANH (last visited Apr. 1, 2025); Bur. Of Consular Affairs, *Get Your Processing Time*, U.S. Dep't of State, https://perma.cc/L988-P8Y5 (last visited Apr. 1, 2025).

service for a passport costs an extra $60 on top of the application and execution fees, and the time to process an expedited request varies depending on demand, at one point taking up to twelve weeks to process a request, and that is after the application is received by the passport agency.[5]

65.    Second, the voter can submit "an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States." Exec. Order § 2(a)(ii)(B). The overwhelming majority of REAL ID cards, however, do not indicate citizenship. The REAL ID Act does not require states to indicate citizenship status on the REAL ID card, and it permits states to issue a driver's license or identification card to both citizens and non-citizens with "lawful status." REAL ID Act § 202(c)(2)(B) (codified at 49 U.S.C. § 30301 (note)). As a result, the vast majority of REAL ID cards do not satisfy the Executive Order's proof-of-citizenship requirement.

66.    "Enhanced" driver's licenses may satisfy this proof option, but these licenses are optional, only available in five states—Michigan, Minnesota, New York, Vermont, and Washington—and come at an additional fee. In Vermont, for example, a REAL ID is available for $39 while an enhanced driver's license costs $75.[6]

67.    Third, the voter can present "an official military identification card that indicates the applicant is a citizen of the United States." Exec. Order § 2(a)(ii)(C). But like driver's licenses, military identification cards do not always indicate citizenship.

68.    Fourth, the Executive Order purports to include allow the voter to submit another "valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship." *Id.* § 2(a)(ii)(D). It is unclear what "proof of United States citizenship" would be accepted under this provision. And other documents, such as birth

---

[5] Bur. Of Consular Affairs, *Passport Fees*, U.S. Dep't of State, https://perma.cc/9BDE-2ANH (last visited Apr. 1, 2025); *see, e.g.*, Office of Congressman Jim McGovern, *District Update*, https://perma.cc/2AKS-VEW7 (last visited Apr. 1, 2025).

[6] Vt. Dep't of Motor Vehicles, *Driver's License Fees* (Sep. 5, 2024), https://perma.cc/6Q5N-GS9P.

certificates (to the extent the Executive Order would even allow for their use under this provision), pose their own set of challenges for would-be voters.

69.    More than 21 million American citizens do not have a birth certificate, a passport, or naturalization papers readily available, according to a recent survey.[7]

70.    The costs and time to acquire a birth certificate vary depending on where an individual was born. For example, obtaining a birth certificate for a person born in Arizona costs $20 and may take up to a week, assuming no delays.[8]

71.    Millions of Americans have changed their legal name and therefore are unable to register to vote with their birth certificates. For example, roughly 84 percent of married women and six percent of married men in opposite-sex marriages in the United States changed their name when they got married.[9] According to one survey, one third of voting-age women do not have proof of citizenship that reflects their current name.[10] In addition, of the roughly 1.3 million American adults who identify as transgender,[11] many have changed their legal names and are therefore unable to register to vote with their birth certificates.

72.    On top of that, many Americans—especially elderly, Black, and brown Americans—have never received a birth certificate.

73.    Elderly Black Americans are disproportionately likely to lack a birth certificate because they were denied equal access to hospitals, including for childbirth, because of legal segregation.

---

[7] Brennan Center for Justice, *Millions of Americans Don't Have Documents Proving Their Citizenship Readily Available* (Jun. 11, 2024), https://perma.cc/A2WQ-49X4.

[8] Ariz. Dep't of Health Servs., *Vital Records: State Office Fees*, https://perma.cc/X595-PDNY (last visited Apr. 1, 2025); Ariz. Dep't of Health Servs., *Vital Records: Apply for Birth Certificate*, https://perma.cc/X974-8DX9 (last visited Apr. 1, 2025).

[9] Luona Lin, *About 8 in 10 women in opposite-sex marriages say they took their husband's last name*, Pew Research Center (Sept. 7, 2023), https://perma.cc/UDK5-EXNM.

[10] Ian Vandewalker, *Analysis: The Effects of Requiring Documentary Proof of Citizenship to Register to Vote*, Brennan Center for Justice (July 19, 2017), https://perma.cc/W2YC-AZPF.

[11] UCLA School of Law, Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022), https://perma.cc/S5LV-LVYG.

74.    In southern states, these issues were compounded by states having more relaxed protocols for registering the births of Black children, failing to implement robust statewide registration regimes, and because of racially discriminatory laws and Jim Crow barriers that limited Black Americans' ability to access such documentation.[12] As a result, some older Black Americans never received a birth certificate.

75.    While many states today issue amended birth certificates (for those who have changed their name) and delayed birth certificates (for those who never received a birth certificate), the process to obtain such a document is demanding and expensive. For example, children born to immigrant and noncitizen parents can face challenges from the federal government when trying to obtain delayed birth certificates.[13]

76.    If a voter was born outside the United States to a U.S. citizen, their ability to prove citizenship is even more limited. Obtaining a Consular Report of Birth Abroad is a complex and costly process that costs at least $100.[14] For reasons described *supra*, Americans who have changed their name will be unable to register with a consular report of birth abroad. In addition, a consular report of birth abroad can only be obtained until the child is 18 years old. Replacing a Consular Report of Birth Abroad costs $50 and requires a notarized request to the State Department.[15]

77.    If the voter's parents did not obtain a consular report of birth abroad, the voter can establish citizenship only through a certificate of citizenship. Whether the voter qualifies for one may be complicated if, for example, the person was adopted or born out of wedlock. Unless the

[12] Susan J. Pearson, *The Birth Certificate: An American History* at 257 (Nov. 16, 2021).

[13] Betsy L. Fisher, *Citizenship, Federalism, and Delayed Birth Registration in the United States*, 57 Akron L. Rev. 49, 51 (2024).

[14] U.S. Embassy, *Consular Report of Birth Abroad*, https://perma.cc/2SQ4-R98H (last visited Apr. 1, 2025).

[15] Bur. of Consular Affairs, *How to Replace or Amend a Consular Report of Birth Abroad (CRBA)*, U.S. Dep't of State, https://perma.cc/5SVB-JWCK (last visited Apr. 1, 2025).

voter qualifies for a fee waiver, the certificate costs $1,385.[16] In addition, it costs $555 to replace or amend the certificate of citizenship.[17]

78.     If the voter is a naturalized citizen and wishes to use a naturalization certificate, that certificate costs $555 to replace or amend, and the process may take upwards of eight months.[18] Over 47% of Asian Americans are naturalized, and that number will only grow as close to 75% of Asian Americans are foreign-born.[19]

79.     U.S citizens who are unable to access proof-of-citizenship documentation will be harmed in two primary ways.

80.     First, those who are not yet registered to vote—including many young adults—will be denied their right to cast a ballot. And it would impose a substantial burden on those who ultimately obtain one at great difficulty.

81.     Second, those who are already registered will be unable to update their registration. If they have moved or changed their name, they may be unable to vote. If they would like to change their party affiliation, they will be unable to do so, and therefore unable to associate with likeminded neighbors or participate in primary elections. This last group is large. Between 2020 and 2022, roughly 44 percent of voter registration applications were used to update registrations with a new name, party, or address.[20]

---

[16] U.S. Citizenship and Immigr. Servs., *G-1055, Fee Schedule* (Mar. 6, 2025), https://perma.cc/KT42-23MU.

[17] U.S. Dep't of Homeland Sec., *Fee Schedule* (Mar. 5, 2025), https://perma.cc/F38Y-6H6R.

[18] *See* U.S. Dep't of Homeland Sec., *Our Fees Chart*, https://perma.cc/3NYC-K3CY (documenting the filing fee) (last visited Apr. 1, 2025); U.S. Citizenship and Immigration Services, *Check Case Processing Times*, https://egov.uscis.gov/processing-times/ (check for most current processing time by form) (last visited Apr. 1, 2025).

[19] These calculations are based on U.S. Census Bureau, 2023 ACS 1 Year Estimates, Sex by Age by Nativity and Citizenship Status, https://perma.cc/JX4G-JPJK (last visited Apr. 1, 2025) (white alone, not Hispanic or Latino), and U.S. Census Bureau, Table B05003D: Sex By Age By Nativity And Citizenship Status (Asian Alone), 2023 American Community Survey 1-Year Estimates, https://perma.cc/VS9E-68Z8 (last visited Apr. 1, 2025).

[20] Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Repor*t, 154 (2023), https://perma.cc/JRT9-VCJR.

**B.  Burdens on Voter Registration Organizations, Including Plaintiffs and Their Members**

82.    The Executive Order's mandate that the EAC require documentary proof of citizenship on the Federal Form will directly impair one of Plaintiffs' core activities—voter registration programming—by making it impossible for them to register voters using the Federal Form. Each Plaintiff's expenditures and responses to the Executive Order, detailed *infra*, are both a symptom of that programmatic injury, and a reflection that Plaintiffs will need to divert their resources toward counteracting the unlawful change wrought by the Executive Order because it harms their interests.

83.    The Executive Order's attempt to direct the EAC to require documentary proof of citizenship on the Federal Form will interfere with a core activity of LWV, LWV Arizona, and NAACP: registering people to vote. Altering the Federal Form to require documentary proof of citizenship will interfere with Plaintiffs' missions and cause them to divert resources in ways that will cause them irreparable harm.

84.    Educating the public about how to register to vote is also a core activity of the League's mission to make sure every eligible potential voter is registered to vote. For example, one of the methods the League uses to accomplish this core goal is to maintain a non-partisan, award-winning website, VOTE411.org. Because VOTE411.org is intended for potential voters nationwide, it provides access to the Federal Form through links to the EAC website and the Rock the Vote registration site, which relies on the Federal Form to provide individuals an opportunity to register to vote. If the Federal Form is changed to require documentary proof of citizenship, the League—and its state and local Leagues—will have to change VOTE411.org to provide that information to the public. And to ensure that the League's mission is achieved, it will be necessary to update VOTE411.org to provide specific information about how to register to vote in every state, so that the website provides information useful to all voters, even those without documentary proof of citizenship. This will be a burdensome task that will divert resources away from the League's other core activities such as advocacy to improve election procedures.

85.    Providing voter registration is one of Hispanic Federation's core missions, and one of the ways it accomplishes this goal is through offering access to TurboVote on its website and at some of its events. TurboVote is a platform based on the Federal Form and as such provides registration access for potential voters from across the county. If the Federal Form is changed to require documentary proof of citizenship, TurboVote will no longer be an effective method for voter registration. Hispanic Federation will have to use resources to update its website to remove TurboVote, and it will have to engage in the burdensome task of evaluating what other ways it can provide voter registration information so that the website provides information useful to all voters, even those without documentary proof of citizenship. This will be a burdensome task that will prevent Hispanic Federation from registering more voters and will divert resources away from its other core activities such as get-out-the-vote efforts and providing voter information and voter protection.

86.    In addition, as part of its civic engagement program, Hispanic Federation provides in-person voter-registration assistance and uses the Federal Form at events with many out-of-state attendees. Hispanic Federation uses the Federal Form at such events so that it can give a copy of the same form to every attendee without attempting to distinguish between residents of different states, which would be impracticable. If the Federal Form required documentary proof of citizenship, running voter registration campaigns at events with many out-of-state attendees would become so burdensome that Hispanic Federation may not be able to register voters because it would have to collect all state forms, and adhere to all state regulations and guidelines.

87.    Conducting voter registration drives across the nation is one of the core activities OCA undertakes in support of its mission to defend the voting rights of the AANHPI community. In addition to conducting voter registration drives, OCA and its chapters also provide links to voter registration on their website to expand the scope their outreach. OCA chapters, including but not limited to OCA-Cleveland and OCA-Pittsburgh, link to online voter registration portals maintained by APIAVote and Rock the Vote. These online voter registration portals rely on the Federal Form to provide individuals an opportunity to register to vote and are available in

numerous Asian languages. If the Federal Form is changed to require documentary proof of citizenship, OCA and its chapters will have to expend resources to change and update this voter registration information, as well as determine whether online voter registration services will be available in Asian languages. At minimum, OCA will have to explain to its members why online voter registration in multiple Asian languages is no longer available on their website. These changes will create fear and confusion among members, the AANHPI communities, and erode OCA's status as a trusted community voice if a comparable online voter registration portal is not implemented. This will be a burdensome task that will divert resources away from OCA and its chapters' other core activities such as youth empowerment and professional mentorships.

88.    APIAVote's core function in service of its mission is to educate AAPIs about how to register to vote and then help them to register. One of the methods APIAVote uses to accomplish this core goal is to maintain an Asian language voter registration portal based on the Federal Form. Community organizations serving the AAPI community often embed this voter registration portal on their websites and use it to further their voter registration efforts.

89.    APIAVote's Asian language voter registration portal is not designed to collect copies of documents showing proof of citizenship as required by the executive order. If the Federal Form is changed to require documentary proof of citizenship, APIAVote will, at minimum, have to change its Asian language voter registration portal to instruct registrants to provide DPOC, including but not limited to the types of allowable DPOC.

90.    In addition to providing an Asian language voter registration portal, APIAVote also provides paperless voter registration through its portal by connecting prospective registrants to state online voter registration systems. APIAVote does not translate state online voter registration systems. If the Federal Form is changed to require DPOC, APIAVote will need to create Asian language guides about how to register to vote using state voter registration processes so that it can provide information useful to all AAPI voters, even those without documentary proof of citizenship.

91.    Changing and updating its Asian language voter registration portal or creating Asian language guides on state voter registration will be a burdensome task that will divert resources away from APIAVote's other core activities such as advocacy to improve election procedures, including providing in-language materials to local election officials as they expand language accessibility in their jurisdictions.

92.    The Executive Order will also substantially encumber the voting rights of members of the NAACP, the League, LWV Arizona, and OCA, for substantially the same reasons outlined *supra* in Section III.A.

**C. Arizona-Specific Burdens on U.S. Citizens and Voter Registration Organizations, Including Plaintiffs and Their Members**

93.    Implementation of the Executive Order will impose a particular burden on LWV Arizona, its members (who are also members of the League), and potential voters in Arizona. The Executive Order's attempt to direct the EAC to require documentary proof of citizenship on the Federal Form will also disenfranchise voters in Arizona without access to proof-of-citizenship documents.

94.    Arizona has long had a bifurcated voter registration system. *See, e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013); Ariz. Rev. Stat. §§ 16-101(A), 16-166.[21]

95.    Under state law, a potential voter must provide documentary proof of citizenship to register to vote using the state voter registration form ("state form"). This state form can be used to register for both state and federal elections. But if documentary proof of citizenship consistent with the requirements of Arizona law is not provided with a state form, it will be rejected. *See* Ariz. Rev. Stat. §, 16-166; *see also Republican Nat'l Comm. v. Mi Familia Vota*, No. 24A164 (U.S. Aug. 22, 2024).[22]

---

[21] *See also* Ariz. Sec'y of State, *Voter Registration Procedures*, https://azsos.gov/elections/about-elections/elections-procedures/vr-procedures (last visited Apr. 1, 2025).

[22] The voter registration system in Arizona is different from the system that the Executive Order seeks to mandate. The Arizona system allows potential voters to provide a choice of different identification numbers on their state form, and then election officials use that number to verify citizenship status. Those numbers are: Arizona driver's license or non-operating license issued

96.     Currently, potential voters in Arizona can still register to vote for federal elections using the Federal Form without providing any documentary proof of citizenship. *See* Ariz. Rev. Stat. § 16-166. As described *supra*, this result is dictated by the FEC and EAC findings (described *supra*) that documentary proof of citizenship is not necessary to determine eligibility, as well as by Supreme Court precedent holding that the NVRA requires states to accept and register otherwise eligible voters using the Federal Form without providing documentary proof of citizenship. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013); *see also Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025). In accordance with the requirements of the NVRA, when a potential voter in Arizona registers without providing documentary proof of citizenship, they are registered as a "federal-only voter" and receive an election ballot with only federal elections.

97.     If the EAC changes the Federal Form as directed in the Executive Order, it will no longer be possible for potential voters in Arizona to register to vote for any elections—including federal elections—unless they can provide documentary proof of citizenship.

98.     The Executive Order's documentary proof-of-citizenship requirement is more restrictive than Arizona's requirement.

99.     The change that the Executive Order mandates to the Federal Form will disenfranchise eligible voters in Arizona, because not all individuals can provide documentary proof of citizenship. As of November 2024, there were more than 53,000 individuals in Arizona registered as federal-only voters. These individuals did not provide any documentary proof of citizenship when they registered to vote.

---

after October 1, 1996, Alien Registration Number, Naturalization Certificate Number, or Citizenship Certificate Number or Indian Census Number, Bureau of Indian Affairs Number, Tribal Treaty Card Number, or Tribal Enrollment Number. *See* Ariz. Sec'y of State, *Arizona Voter Registration Instructions* (May 2024), https://perma.cc/ULM9-HWQQ. As a result, many potential voters in Arizona can successfully register to vote without having to track down and photocopy actual documents. But as noted even with this system, tens of thousands of eligible voters in Arizona cannot provide these numbers and must rely upon the Federal Form to register to vote.

100.    LWV Arizona regularly conducts voter registration drives in Arizona, and, in their experience, if a potential voter can provide documentary proof of citizenship when registering, they typically provide it so they can vote a full ballot. The existence of these already registered federal-only voters in Arizona establishes that there are meaningful number of voters in Arizona who do not have access to these documents. And there are likely many more potential voters who will register in the future in Arizona who similarly will not be able to provide documentary proof of citizenship.

101.    Ensuring that every eligible potential voter in Arizona is registered to vote is a core activity of LWV Arizona's mission. If the requirements of Federal Form are changed to require documentary proof of citizenship, LWV Arizona will not be able to accomplish this core goal because there are eligible voters in Arizona who do not currently possess or have access to the necessary documentary proof of citizenship.

102.    Even if potential voters have access to these documents, LWV Arizona will be unable to help these individuals register to vote given the burden of providing these documents. Section 2(a)(ii) of the Executive Order requires "a copy of" documentary proof of citizenship, which can include a United States passport, REAL ID from only five states, or military identification. These are highly sensitive documents containing personally identifying information that, if collected by LWV Arizona, could expose them to liability under various privacy laws.

103.    Even if LWV Arizona volunteers were willing to collect, store, and transmit sensitive information, it would be infeasible to do so. LWV Arizona volunteers would be required to take copiers to voter registration drives, collect copies of these sensitive documents, and store and transport them securely before submitting them. LWV Arizona does not have the resources to take on this effort. This means that, while conducting voter registration drives, LWV Arizona will have to turn away eligible potential voters instead of providing them with assistance to complete their registrations. Turning away potential voters without registering them is a direct frustration of LWV Arizona's core mission.

104.    LWV Arizona will have to re-train all its volunteers about the changes in the Federal Form requirements, which will require the diversion of resources from other activities. This additional training will be particularly burdensome on LWV Arizona resources because most volunteers were trained about voter registration several times in 2024 given the Presidential Election. These volunteers would not need to be trained this spring but for the changes to the Federal Form. Taking volunteer time to conduct and participate in trainings will mean that LWV Arizona has less resources and will conduct less voter registration drives than it would if additional training was not needed. And resources will be diverted away from other activities such as forums to educate their members and the public about ways to protect democracy.

105.    Educating potential voters about how to register to vote and why it is important to vote is also a core mission of LWV Arizona and NAACP. For example, if the requirements to use the Federal Form are changed, LWV Arizona will have to change its public-facing educational material to explain the changes. This will divert resources away from other education efforts about why it is important to vote. Moreover, it will be a barrier to encourage more participation if more complicated rules of how to register to vote must be explained.

106.    These harms are imminent because there is a special federal election in Arizona on July 15, 2025.[23] The uncertainty of whether there will be changes to the requirements of the Federal Form in the next 30 days as the Executive Order mandates creates current and ongoing harms because LWV Arizona is currently conducting voter-registration drives and planning further voter-registration drives in the immediate future in the advance of this special federal election. The voter registration deadline for that election is June 16, 2025. *See id.* Absent immediate relief from this Court, LWV Arizona members will be forced to cease registering voters using the Federal Form, as they cannot collect the proof of citizenship mandated by Section 2(a)(ii) of the Executive Order. In turn, this will result in the disenfranchisement of otherwise eligible voters not reached by LWV Arizona's voter registration drives because of their inability to use the Federal Form.

---

[23] *See 2025 Congressional District 7 Special Primary and Special General Election Information: Important Dates*, Ariz. Sec'y of State, https://perma.cc/Y6AK-WUKC (last visited Apr. 1, 2025).

**CLAIMS FOR RELIEF**
**COUNT I: Violation of Separation of Powers Doctrine**
**(U.S. Const. art. I, §§ 1, 4)**
**All Defendants**

107.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

108.    The Constitution authorizes private Plaintiffs "to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The claim "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*

109.    "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The President acts at the lowest ebb of his power if he acts contrary to the expressed or implied will of Congress. *Id.* at 637 (Jackson, J., concurring). The President may not enact, amend, or repeal statutes. *Clinton v. City of New York,* 524 U.S. 417, 438 (1998).

110.    The Constitution assigns to Congress and the states the power to regulate federal elections. Congress prescribed the contents of the Federal Form in the NVRA. And the Constitution gives to Congress—and not to the President—the power of the purse. The Constitution assigns no power to the President concerning federal elections or spending.

111.    Congress prescribed the contents of the Federal Form and delegated the responsibility of administering and maintaining that form to the EAC, which is a bipartisan independent agency. The President has no authority to override Congress' determination or to regulate how the EAC maintains or makes determinations concerning the Federal Form.

112.    The Executive Order violates the Constitution's separation of powers because the President has no authority to mandate the inclusion of a documentary proof-of-citizenship requirement on the Federal Form. It also violates the separation of powers because the President has no authority to withhold congressionally-appropriated funds from the states.

113.    The Executive Order usurps Congress's legislative authority and violates the Constitution's separation of powers.

114.    Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful to the extent it purports to direct the EAC's actions, including to add a documentary proof-of-citizenship requirement to the Federal Form.

115.    Plaintiffs have no adequate remedy at law.

### COUNT II: Equitable Relief for Violation of Federal Law
### (52 U.S.C. § 20508)
### All Defendants

116.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

117.    The Constitution authorizes private Plaintiffs to sue to stop "violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327. The claim "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*

118.    In Section 9(a)(2) of the National Voter Registration Act, as modified by Section 802 of the Help America Vote Act, Congress tasked the EAC, in consultation with the chief election officers of the States, with "prescrib[ing] such regulations as are necessary" to "develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a)(1)–(2). The NVRA further provides that the Federal Form "may not include any requirement for notarization or other formal authentication" and "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1).

119.    Even if Congress had delegated authority to the President to regulate the Federal Form (and it did not), and even setting aside the unconstitutional burden on the right to vote that this requirement would impose, the President still could not add—or instruct others to add—a documentary proof-of-citizenship requirement to the Federal Form without first finding that it was necessary to assess voter eligibility.

120.    The Executive Order imposes a categorical command on the EAC to add a documentary proof-of-citizenship requirement—irrespective of its necessity. In addition, such a

requirement goes beyond "identifying information" permissible under the statute and is not "necessary to assess the eligibility" of applicants.

121.    The Executive Order therefore violates the NVRA.

122.    Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful to the extent it purports to direct the EAC to add a documentary proof-of-citizenship requirement to the Federal Form.

123.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Declare that the Executive Order is unlawful to the extent it purports to direct the EAC to take action, including to change the Federal Form;

2.    Preliminarily, and then permanently, enjoin implementation of the Order to the extent it purports to direct the EAC to change the Federal Form;

3.    Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4.    Grant all such other and further relief as the Court may deem just and proper.


Dated: April 1, 2025                                    Respectfully submitted,



                                                        */s/ Megan C. Keenan*
Wendy R. Weiser*                                        Megan C. Keenan (DC Bar No. 1672508)
Sean Morales-Doyle*                                     Sarah Brannon* (DC Bar No. 90024493)
Eliza Sweren-Becker*                                    Adriel I. Cepeda Derieux* (DC Bar No.
Jasleen K. Singh*                                       90026636)
BRENNAN CENTER FOR JUSTICE AT                           Jacob Van Leer (DC Bar No. 1742196)
NYU SCHOOL OF LAW                                       AMERICAN CIVIL LIBERTIES UNION
120 Broadway, Suite 1750                                FOUNDATION
New York, NY 10271                                      915 15th St. NW
(646) 292-8310                                          Washington, DC 20001
weiserw@brennan.law.nyu.edu                             (740) 632-0671
morales-doyles@brennan.law.nyu.edu                      mkeenan@aclu.org
sweren-beckere@brennan.law.nyu.edu                      sbrannon@aclu.org
singhj@brennan.law.nyu.edu                              acepedaderieux@aclu.org

Leah C. Aden*
John S. Cusick*
Brenda Wright*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
jcusick@naacpldf.org
bwright@naacpldf.org

Miranda Galindo*
Cesar Z. Ruiz*
Delmarie Alicea*
LATINO JUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
mgalindo@latinojustice.org
cruiz@latinojustice.org
dalicea@latinojustice.org

Sophia Lin Lakin*
Ethan Herenstein*
Jonathan Topaz*
Clayton Pierce*
Davin Rosborough*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org
eherenstein@aclu.org
jtopaz@aclu.org
cpierce@aclu.org
drosborough@aclu.org

Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
mperloff@acludc.org
smichelman@acludc.org

Niyati Shah (D.C. Bar No. 1659560)
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, D.C. 20036
(202) 296-2300
nshah@advancingjustice-aajc.org

*Counsel for Plaintiffs League of Women
Voters Education Fund, League of Women
Voters of the United States, League of Women
Voters of Arizona, Hispanic Federation,
National Association for the Advancement of
Colored People, OCA-Asian Pacific American
Advocates, and Asian and Pacific Islander
American Vote*

*Pro hac vice* motion forthcoming

34